Good morning, Your Honors. May it please the Court, Patrick Hooper for the appellant. I would like to reserve about five minutes for rebuttal if possible, and I need to go through some background here, so if you'll bear with me. It is our opinion, most respectfully, that the Secretary of the Department of Health and Human Services has lost his institutional memory with respect to the issues in this case. And I don't mean that disrespectfully. I just mean that as these issues progress over time, sometimes the interpretations change. The interpretations underlying the issues here, whether or not you revalue assets as a result of a statutory merger, go back to the early Medicare program in the late 1960s and early 1970s. And I might say I had just begun practicing in that field at the time. And I only say that because one of the cases that dealt with this issue early on ñ You don't get the institutional memory. I'd like to say that, but I'm not certain the Court's going to take notice of that. But I can say Judge Goodwin was involved in the PCME case, Pacific Coast Medical Enterprises, that was issued in 1980. And that case becomes very important here, because as we will see, when we're looking at the regulation when it was enacted, the regulation that we're looking at here was proposed in 1977 and was enacted in 1979. And these early cases are very important because they speak about what the Secretary was actually concerned about, including this letter I refer to as the Wolkstein letter. And Judge Nelson, I've been observing in these two immigration cases where you've asked about scope of review or standard of review deference, and that is critical to this case. It was critical to the Tenth Circuit in the Villa-Christie case. But most respectfully, we think the right evidence wasn't presented to the Tenth Circuit in the Villa-Christie case. Remember, the Villa-Christie case, the Court said, we're going to rely on the Thomas Jefferson decision out of the United States Supreme Court. That's a Medicare case in which the Supreme Court said, Obviously, when the agency with expertise is interpreting its own regulations, it's entitled to considerable deference. However, it goes on and says, unless an alternative reading is compelled by the regulation's plain language or other indications of the Secretary's intent at the time of the regulation's promulgation. Excuse me. And what I'm talking about today with the Wolkstein letter, which is referred to in the Ninth Circuit's Pacific Coast Medical Enterprises case, referred to in the Home and Crime and Fifth Circuit case that I was involved with back in 1980, and involved in many other cases, that was the agency policy that gave rise to this amendment. That is the agency policy that is completely omitted from the Tenth Circuit's opinion in the Villa-Christie case. And let me go on if I can. What the concern was about this time, early on in these cases, was hospitals were being sold at prices higher than their fair market value of their assets, higher than their book value of their assets. And as a result, there was what they call a step-up in the cost basis, and Medicare ended up paying more for depreciation in those cases in which you were allowed to revalue the assets and increase the cost basis. The issue became what kind of transactions would allow a provider to increase the cost basis for an asset. And what was happening was because you had corporations buying hospitals in those days, in the late 60s, early 70s, they were buying the stock of some corporation hospitals, and the secretary was disturbed that there had been some decisions issued by the Provider Reimbursement Review Board and by some courts that said if you buy the stock of the corporate provider, we're going to treat that as a disposal of assets, we're going to treat that as a purchase of assets, and we're going to allow the buyer to step up the basis and to claim additional depreciation. In response to that, the secretary issued some policy statements, the most important of which is here is the so-called Wolfstein letter. And I think Mr. Wolfstein was a high official in the Medicare program at the time, and he issued a letter in 1974 which is part of the record, a critical part of the record, and referred to throughout our briefs. And he opined on behalf of Medicare that the key to determining whether to revalue the assets in an acquisition is whether the acquisition is the type of acquisition that changes the legal ownership of the assets. And he came up with the concept that your honors are all very familiar with, that a corporation is separate from its shareholders, and thus if there's a corporate owner of a hospital and someone only buys the stock of that corporation, there's really not been a change in the legal ownership of the assets. And in his letter of 1974, he said, therefore, that doesn't trigger a revaluation of assets. But very clearly in that same letter, this is what I think this case turns on, he says that's not true with respect to a statutory merger. He recognized that in a statutory merger, there was a change of ownership of the assets. And we are going to treat a statutory merger, and this is, it doesn't say with a statutory merger, you have to prove you're the same as a sale. We're going to treat it as a sale of assets. Now, all of this is in the record. And in 1977, 1977, when the secretary decided after losing cases like Pacific Coast Medical, well, it was actually before he lost Pacific Coast Medical Enterprises at the Ninth Circuit level, which was 1980, but he had lost it before then. He decided, I'm going to take the Wolfstein letter and these policy interpretations, I'm going to codify them in a regulation, and he issued a regulation, a proposed regulation in 1977. And in that proposed regulation, in the record at page 227 of the excerpts of record, it is stated very clearly that, quote, a statutory merger is treated as a sale of assets. Now, that doesn't mean if you do a statutory merger, you have to show you're a sale of assets. It just means we're going to treat it. We're going to deem it as a sale of assets. In 1979, it took him two years to finally respond to comments and finally issue a letter. Excuse me, finally issue a final decision in 1979. And in that final rulemaking decision, he said, we're going to amend the regulations. It's the 1979 amendment we are involved with here. And at page, let me just get the records here for a moment. At the excerpts of record, at page 224, for example, and actually even before that, let's go back to page 222 of the excerpts of record. This is the 1979 rulemaking, which I think everyone would agree that that is what the Secretary's interpretation should be at the time. He says, our intent is not to change what we say is Medicare policy. We're just going to incorporate the Wolkstein letter concepts. And then even, and that's at page 222. Then in the excerpts of record at page 224, I think this becomes critical. In 1979, the Secretary says in a comment, in response to a comment, he says, this rule will not destroy certain business combinations. And he says it's not clear what this rule's effect is going to be, but he expects people dealing in this business, the health care business, to take these new policies into effect when they structure. And what he says, when they structure their deals. And one of the things he says is certainly the rule will not discourage statutory merger and consolidations between unrelated parties, since it allows the revaluation of assets for those transactions. The reason I say that's important is one of the things the government says in its brief is that Robert F. Kennedy and the buyer of, excuse me, the other party to the statutory merger here, structured their deal to take advantage of Medicare regulations. That's exactly what the Secretary contemplated. It's just like the tax law. Well, I don't want to use up your time with this question, unless it's relevant. But the district court found that the fair market value wasn't paid in this merger. And that seems to be an important fact question. I agree with Your Honor. And this is the essence of it. And I hope I'm not being too technical, but I think it's critical here. I agree that if someone buys and sells hospital assets in a normal sale, not a statutory merger, the focus of the negotiations often is over how much are you going to pay for that hospital asset, how much are you going to sell that hospital asset for. And therefore, when you are dealing with a direct sale of hospital assets, I think the fair market value of the assets becomes an important part of the bargaining. But when you're dealing with statutory mergers where there's not a sale of an asset, per se, or a buyer who's going to walk away with cash or some other consideration, but you're going to have two parties coming together, as the Secretary contemplated back in 1979, it's our opinion that the fact that the consideration does not necessarily cover the fair market value of the assets doesn't mean it's a non-bonafide transaction. But, Counsel, there was no consideration for the hospital facilities that were valued at $12.6 million. Now, let me, if I may, Your Honor, very cogent point. I know the government comes in and they make it look like we're gaming the system here. But what really, at page 49 of the administrative record, the excerpts of the record here, you will see that that's not entirely accurate. What happened was, you're right, the consideration given for the merger was we will acquire your liabilities, we'll give you $2 million cash. That works out to be about $30 million. That covers the current asset value of the hospital at the time. It doesn't cover any of the fixed assets is what I think Your Honor is getting at. The PRRB, the Provider Reimbursement Review Board, these are pretty expert people that Congress designated to hear these cases, said, well, here's what we want you to do. We want you to take the consideration, which is about $32 million, and we want you to spread that consideration over the value of all assets. Hospital, you had incorrectly allocated it only to the current assets, and so, therefore, nothing was allocated to the fixed assets, so it looked like there's no price paid. The PRRB fixed that by saying, do allocate some of that consideration to the fixed assets. Now, I agree with you that the amount of the consideration that was, therefore, allocated to the fixed assets, may not equal what someone might consider to be the fair market value of the assets. I agree with you, Your Honor, and if we were here on a direct sale of assets, which was the case in Lehigh, a Third Circuit case, I wouldn't be here before you. But I think where we are in this case is the Secretary enacted a regulation that said very clearly that a statutory merger is going to be treated just like a sale, even though we know a statutory merger is a different kind of transaction, we're going to treat it just like a sale. And we think the Secretary is bound by that regulation. What we think happened, and what I can represent to the Court did happen, is no one was upset about this treatment until hospitals began selling at losses in the late 1980s and in the 1990s, and when nonprofit organizations like Robert F. Kennedy decided that the only way they were going to survive in the health care industry, and this is all on the record, is if they consolidated with other larger hospital corporations so that they could do, they'd have greater leverage with third-party payers and HMOs and others. So they did structure this as a statutory merger. You are correct, it is not a dollar-for-dollar allocation to the assets. It looks like they've got the assets for free. The PRRB fixed that a little bit, but we're saying that's the natural consequence of the regulation, and that the way you cure this, and where I'm coming from is this, we believe, most respectfully, the Secretary can't all of a sudden change interpretations from 1979 to 1996, because he doesn't like the outcome of the natural reading of this regulation. What he had to do at that point was go to Congress and change the law or change his regulation. Actually, they went to Congress, changed the law, and beginning in 1997, this doesn't exist anymore. You don't get these losses on sales like this. But then he was stuck. And the tremendous windfall as a result of these, quote, statutory mergers. Well, you characterize it as a windfall. It's interesting, Your Honor, and I certainly respect your viewpoint on that. I characterize it as when two nonprofits negotiate over a statutory merger, they may have different ideas in mind. If we're guilty of something here, I just want to point this out, and then I want to reserve some time here. Page 26 and 27 of the excerpts of records, very interesting, because the Secretary says, a little bit in line with what you're saying, in this case, there is no evidence in the record of arms-length bargaining, nor an attempt to maximize any sale price as would be expected in arms-length transaction. In particular, the administrator notes that the provider was more concerned with community considerations and the future of the provider rather than obtaining fair market value for assets. That's at pages 26 and 27. If that's wrong, we're guilty. We accept that. I view it a little differently. I view it as we had a regulation that the Secretary contemplated we would follow in 1979. We followed it. The Secretary subsequently learned, ah, if nonprofits start statutory merging, we're going to have to start paying out a lot more money. So I don't view it as a windfall. I view it as requiring the agency to adhere to its regulations and not rewrite those regulations unless it goes to Congress or unless it goes through rulemaking. That's the best I can do on that, Your Honor. Thank you. Thank you. May it please the Court, my name is Joel McIlvain, appearing on behalf of the FLE. The Secretary of Health and Human Services has a statutory mandate to pay Medicare providers their actual and reasonable costs incurred in providing health care services to Medicare beneficiaries. But his statutory mandate is to pay only those actual and reasonable costs incurred. One of those costs can be depreciation of equipment used to treat Medicare patients. And that depreciation is calculated on a particular schedule, and the Secretary has also provided for ways to correct that schedule if there's reason to believe that the schedule hasn't accurately reflected the provider's actual and reasonable costs incurred in providing treatment. So that when an asset is disposed of and you have reason to believe that the value of the asset is different from what the depreciation schedule would have contemplated, then you correct it at that time. So, for example, in a bona fide sale, a sale where assets are sold for fair market value, for reasonable consideration in an arm's-length exchange, and the assets valued in that way show that less depreciation had been incurred or more depreciation had been incurred, an additional Medicare payment can be made or Medicare payments could be recouped at that time. Now, in this case, what we have, as you noted, Judge Nelson, we have a case where essentially $29 million, $28 or $29 million worth of assets that were valued in an appraisal after the transaction were sold for what essentially the provider claimed to be zero, no consideration at all. In other words, the provider was coming to the Secretary and saying, we want this to be treated as if this equipment had been completely depreciated, is now completely valueless past all the available depreciation on this equipment. It's perfectly clear that, in fact, the equipment was not completely valueless. The appraisal showed that they were not, that they still had significant value. In fact, the appraisal showed that they would have recognized a Medicare gain in the sale rather than any Medicare loss. And so the administrator properly found that, in fact, there was not fair consideration paid here and that it would be inappropriate to pay the provider this Medicare claim because there were no actual and reasonable costs that had not already been reimbursed by the Secretary. Now, as I understand the provider's claim, I understand them to acknowledge that fair market value is not paid here, but they claim that mergers should be treated differently from sort of the plain vanilla straight-up sale of equipment. But if you look at the regulation, it's clear that that treatment is both contrary to the statutory mandate to pay only actual and reasonable costs, and it's also contrary to the language of the regulation. If you look at 42 CFR 413.134L2, it tells you that in the case of a merger of unrelated corporations, the merged corporation would be subject to the provisions of Paragraph F of this section concerning the realization of gains and losses. Paragraph F deals with realizations in cases of bona fide sales and other circumstances where gain-loss realization would be appropriate, although the only particular aspect of Paragraph F that's relevant here is the bona fide sale provision. So tellingly, subsection L does not say if there's a merger, you automatically allow a gain or loss in any amount claimed by the provider. Instead, Paragraph L tells you, look at this other preexisting section, Paragraph F, that tells you what kinds of transactions result in gain-loss treatment and tells you how to calculate gains or losses depending on what sort of event has occurred. So without that reference, you wouldn't know whether to allow a gain or loss or how to calculate any gain or loss that may result, which is entirely what the Secretary's policy is now and has been. It is not automatic that mergers will result in gain-loss treatment. It's not automatic that mergers won't. But if a merger satisfies the preexisting requirements of Medicare law that exists for all other transactions, then it will be treated similarly to these other transactions, and the same rules will apply to the merger as to a straight-up, straightforward sale. Let me ask you about the sale. Yes. Assuming that there was not adequate consideration, wasn't there something in the record about this was a bona fide sale because there were extensive arms-length negotiations before the merger? What would your response be to that? There were certain discussions before the merger. What they went to was as to how much continued membership of the old board and management team of RFK would continue with the new entity. What those negotiations did not involve were negotiations about an actual purchase price, and that's why it wasn't an arms-length transaction in the sense that you would imagine would occur in a true bona fide, straightforward sale. You would expect the parties to attempt to determine the value of the assets, negotiate over the purchase price of the assets, strike at a fair exchange. And here none of that occurred. In fact, while the assets have been appraised, that only happened a year after the transaction. You would ordinarily expect if parties are trying to negotiate over a purchase price, they would attempt to engage in that appraisal before the fact. And, of course, that appraisal shows that the equipment had substantial value, even though for Medicare purposes what they wished to treat it as was a sale of those assets for essentially zero. So it's certainly not the case that they had any negotiations over the purchase price. Thank you. I think the appellant sent in a 28-J letter talking about the Tenth Circuit case. Could you tell us what your view of the Tenth Circuit case is on this case? Yes. And, of course, there are two issues in this case as there were in the other. Well, there's a post-merger relationship question, which we may not need to reach. But if we do, we'd like to hear what you have to say about that also. Certainly. There were the two issues, the bona fide sale issue and the related parties issue. And I'll begin briefly with the bona fide sale issue because that's part of the vehicles. I'm most interested in the bona fide sale. And the post-merger behavior we can sort out from the record, I think. Certainly. And I prefer to focus on that because that's the part of the vehicles opinion that I like, of course. The Tenth Circuit held, of course, that you apply the ordinary rules of deference. This is a matter that involves the Secretary's interpretation of his own regulation, which has always accorded a great deal of deference, but especially in the area of Medicare because it is so highly regulated and highly complex. You apply special deference to the Secretary's views. And in applying that level of deference to Section 413.134L and 413.134F, the Tenth Circuit looked at the interpretation and found it to be perfectly reasonable that the Secretary wishes to, again, not always allow gain-loss treatment for every merger or always disallow gain-loss treatment for every merger, but instead that mergers should be treated just like sales. If there's fair consideration, if the transaction involves some basis to determine that the transaction reflects a difference in the actual and reasonable costs that the provider has incurred in the use of the equipment, then you can make the adjustment at that time. But if it doesn't, then no adjustment would be appropriate. So in that aspect of the Via Christi opinion, I think, was very well-reasoned, and I urge the Court to follow that reasoning. Is that program memorandum that the Secretary uses, was that involved in the Tenth Circuit case? Yes, it was, Your Honor. Program memorandum A-00-76. That gives the Court some help on what is a bona fide sale. Yes, that reflects that a bona fide sale is a sale that is an arm's-length transaction. You know, parties with opposing interests negotiating at a fair distance. Did that memorandum come out after the Wolkstein letter in 1979? The timing is that the Wolkstein letter was issued in 1974. The regulations that are at issue here were promulgated in 1979, and the program memorandum was issued in 2000. So the relevant relationship is that the program memorandum is an interpretation of those 1979 regulations. The relevance of the Wolkstein letter is that they were referred to by the Secretary in the Federal Register Notice in 1979, or perhaps in 1977, one of the Federal Register Notices involved in the promulgation of the regulation. Of course, of the three, it's the regulation that controls, but the Wolkstein letter is relevant in that the Secretary referred to it in promulgating the regulation. And I do respectfully disagree with the Appellant's counsel. I think the Wolkstein letter is entirely affirmative, further affirmative evidence in support of the Secretary's position. That letter says mergers should be treated like sales, and that's a proposition that we completely disagree with. A merger should be treated like a sale. The district court agreed with you about that, too. Yes, Your Honor. If a sale is bona fide, you realize any gain or loss that would result from that calculation from the consideration that was exchanged. If it wasn't bona fide, then you don't result. That's the normal rule for a sale, and that's the normal rule for a merger. So your position is really supported by the Wolkstein letter? I believe so. Okay. I believe so. Another point on that same issue is if you look to the Federal Register of Notices, an important part of the notice is the Secretary says, our position on mergers and other complex transactions like stock exchanges has always been to follow what the existing regulations are, and he referred to the various existing regulations in place at that time in 1979. Subsection L was added as an overlay to what was already a comprehensive scheme for what governs gain or loss treatment. The underlying motivation for this merger was? I have no reason to dispute appellants' characterization that they faced competitive pressures and felt that it was necessary to consolidate. So there's no question whatsoever that it was appropriate for them to seek a merger, and there's no reason to judge those motivations adversely. The only thing that's relevant for our purposes is that those motivations did not involve a motivation to gain fair value for the merging corporation, and because there was no attempt to do that, there's no basis to determine what the actual value of the assets were that was being exchanged, and so there's no basis to go back and readjust the Medicare depreciation schedule that they had already incurred. Well, you're saying that basically the Kennedy property was being transferred or merged with the Wall Street property, and the Wall Street property was going to pay off the debts of the Kennedy property, which were considerable. Essentially what happened in the merger was that all of RFK's assets and all of RFK's liabilities were transferred to the surviving corporation, and they had liabilities in the amount of, I believe, $28.6 million. Current assets, that is just cash and cash equivalents of about $28.9 million, and then the non-current assets, which includes the Medicare equipment that's the subject of this appeal, and some other properties as well, added up to a total of $28.1 million. So essentially they sold their cash for their liabilities, and they sold their non-cash assets for zero, and of course there's some question as to whether that's the right way to allocate liabilities to assets or whether you would spread it around among the various assets, but either way you look at it, it's well, well, well short of what really would be fair market value for those assets, which again may be a perfectly appropriate thing for RFK to do. There's no reason to question their motivations for structuring the transaction the way that it was. It may have been perfectly appropriate to seek this merger as the best way to continue forward, but again what it was not was a transaction that allowed a calculation of what the actual value of the assets were or allowed any sort of recalculation of what the appropriate depreciation allowance should have been, that they were already gaining on those assets. Are there any more of these similar cases where the Secretary has treated a merger with these organizations, that is St. Francis and Catholic Hospitals West, had treated those as not bona fide sales? Are we going to have a flock of these cases or is this just one isolated case out there? There are several other cases. There was the Via Christi case that we've already discussed. It looked like from the discussion in this case that the larger organization was gathering up some of the smaller ones and there's some economies of scale in managing them that way. I don't know if there are other cases that involve this particular transaction. There are nationally a couple of cases pending in the Third Circuit that were mentioned in our Rule 28J letter. There are about four or so other cases pending in district court and I think that there are several dozen that have been pending administratively. So there is a small universe of cases that are out there that raise similar issues to this. I'd like to turn, if I could, to the related parties issue and, again, as the Court is aware. Related parties, okay. I'm sorry? Yeah, tell us about related parties. And, again, as the Court is aware, if you agree with the district court and you agree with the administrator on the bona fide sale issue, there's no reason to reach this second issue, but it is an independent ground for affirming the decision of the administrator. A second issue presented by this is that this was a transaction between related parties. And for reasons similar to the bona fide sale rule, the secretary applies a related parties rule to make sure that there is a real transaction that involves a real exchange of value that allows for a real valuation of the assets that would justify recalculating the Medicare depreciation if needed. Section 413.134L2 says that in the case of a statutory merger, that no gain or loss will be allowed if the statutory merger is between two or more related corporations, as specified in section 413.17. So, and as I understand the dispute between the parties, that's fairly plain. We all agree that if there are related parties, there's no gain or loss just under the plain language of the regulation. As I understand the dispute is the appellant wishes to look only to the relationship of the parties before the transaction occurred at all, whereas the secretary's position is all aspects of the relationship must be considered. That is, the relationship at the time of the merger itself and going forward, including a relationship created by the transaction itself, must also be considered to determine whether the parties are related. For example, when you have a case here where there are members of the board and the management team that will continue to operate, have a continuing significant power to exercise control over the assets that are allegedly being surrendered, that would be a related party transaction as well. Well, as I read the Tenth Circuit case, the Via Christi case, they seem to say it was only the relationship before the merger. I take it the agency thinks the Tenth Circuit was wrong. The agency does think that the Tenth Circuit was wrong, and as I mentioned before, that's why I prefer to focus on the bona fide sale issue because it's always better to be in front of you with favorable authority rather than unfavorable authority. But we do believe that the Tenth Circuit was wrong, and I think that their concerns are answered by the actual language of the regulation itself. They were considering a consolidation which falls under L3, not L2, so they weren't considering a merger. We don't believe that the legal rules should be different from mergers or consolidations, but I believe that the Tenth Circuit missed relevant language in L2 because their focus wasn't in a consolidation. What the Tenth Circuit held wasn't a holding. It was a dicta, but it was a significant part of their opinion. What the Tenth Circuit stated was only the relationship of the parties prior to the transaction should be considered. I believe that's a direct quote from the opinion. But if you look to subsection L2, which deals with mergers, it says it provides an example, and it looks at the relationship existing at the time of the transaction. So it's not prior to, it's any relationship created, even a relationship created immediately at the moment of the merger. So if you look to L2, you will find the Tenth Circuit's concerns answered, I believe. And it's also answered if you look to the overall purpose of the related party rule. And, again, I've gone perhaps a great length as to the purpose of the bona fide sale rule to ensure that there are real actual costs that are being reimbursed. The related party rule goes to those same considerations. And the danger of self-fueling that arises from a related party transaction is not limited only to transactions where parties are already related before the transaction occurs. It also comes up in a case where parties are negotiating with each other and agree that they will continue to have a relationship going forward. That's the Medical Center of Independence case from 1980, which was not a merger. It was a continuing contractual relationship. So it's the same issue there where a relationship was created as part of the transaction itself and the parties would continue to be related to each other going forward. That's the sort of transaction that also involves the potential of danger for self-fueling. And I believe that that same consideration applies in the case of a merger where there is going to be a continuing relationship of the parties going forward. Pardon me. So that's the Secretary's interpretation of the related party rule that involves not just the relationship of the parties before the transaction but the relationship at the time and going forward. And for those two independent reasons, the bona fide sale rule and the related party rule, we would urge affirmance of the district court. Thank you. Thank you. I'll try to speak very quickly here, Your Honors. Even if the Via Christi Tenth Circuit got it wrong, which they did in the related parties, there's no relatedness after this statutory merger. RFK had one out of 16 board members appointed to the board afterwards. That hardly qualifies under any definition of related parties. Finally, a few other points. We have a basic administrative law principle we disagree over here. We believe that the Secretary has to abide by his interpretation and his views when he enacts a regulation back in 1979, not when his lawyers or his inspector general decides that Medicare is paying too much money in 2000. And that's what we have here. If you look at the policy statements and views announced in 1979, they're very different from the 2000 memo that Your Honor was asking about. That's 26 years after the Wolfstein letter was written. What happened was obviously the Secretary didn't foresee all the consequences that were going to result from his interpretations. And once he foresaw those in the late 1990s and 2000, he decided, hmm, better forget about those viewpoints. And he can't do that as our position. He has to be bound by those views that existed then. And why is that a life sentence, that Wolfstein letter? Why does that last forever? It doesn't. It doesn't, Your Honor. And, Your Honor, I urge you to look at your Pacific Coast medical enterprise. It doesn't last forever at all. And the Secretary, all he had to do was go back and amend the rules as he did originally in 1979. What I don't think he can do is take those same rules as he interpreted them and 20 years later interpret them a different way to save money. And that's what this is all about. And here's the big difference, Your Honors. I'm really not playing a game here on this. The Wolfstein letter and the regulation preamble, as written in 1979, says, statutory mergers are to be treated as a sale of assets. In a very different statement, counsel just said they are to be treated like a sale of assets, which means that you have to meet the same requirements for a statutory merger as you do for a sale of assets as far as bona fides. When you negotiate in a statutory merger, the bona fides of a negotiation in statutory mergers are very different from the bona fides of a negotiation in a sale of assets. In the one case, there's a marriage and you're going to be together and one's going to assume the liabilities, as was the case here. And in the other case, one party's going to take the money and run. Obviously, there are very different considerations. The secretary, though, said back in 1979, a statutory merger is to be treated just like a sale of assets. So there are bona fide statutory mergers and there are bona fide sales. This was a bona fide statutory merger, which doesn't have to look like a bona fide sale. Thank you very much. Thank you. This matter will stand submitted and the court for this session will adjourn.
judges: Goodwin, Pregerson, Nelson